# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself and its clients; HIAS, INC., on behalf of itself and its clients; JOHN DOES #1 AND 3; JANE DOE #2; MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members; MUHAMMED METEAB; PAUL HARRISON; IBRAHIM AHMED MOHOMED; ARAB AMERICAN ASSOCIATION OF NEW YORK, on behalf of itself and its clients,
*Plaintiffs – Appellees*,

and ALLAN HAKKY; SAMANEH TAKALOO,
*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; REX TILLERSON, in his official capacity as Secretary of State; DANIEL R. COATS, in his official capacity as Director of National Intelligence,
*Defendants – Appellants.*

No. 17-2231 (L)
On Cross-Appeal from the United States District Court
for the District of Maryland, Southern Division
(8:17-cv-00361-TDC)

[Caption continued on inside cover]

## THIRD CROSS-APPEAL BRIEF FOR APPELLANTS

NOEL J. FRANCISCO
*Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
*Deputy Solicitors General*

CHAD A. READLER
*Principal Deputy Assistant Attorney General*

STEPHEN M. SCHENNING
*Acting United States Attorney*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

---

No. 17-2232
(8:17-cv-02921-TDC)

---

IRANIAN ALLIANCES ACROSS BORDERS; JANE DOE #1; JANE DOE #2; JANE DOE #3;
JANE DOE #4; JANE DOE #5, JANE DOE #6,
*Plaintiffs – Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; ELAINE C. DUKE, in
her official capacity as Acting Secretary of Homeland Security; KEVIN K. MCALEENAN, in his official
capacity as Acting Commissioner of U.S. Customs and Border Protection; JAMES MCCAMENT, in his
official capacity as Acting Director of U.S. Citizenship and Immigration Services; REX TILLERSON;
JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States,
*Defendants – Appellants.*

---

No. 17-2233
(1:17-cv-02969-TDC)

---

EBLAL ZAKZOK; SUMAYA HAMADMAD; FAHED MUQBIL; JOHN DOE #1; JOHN DOE #2;
JOHN DOE #3,
*Plaintiffs – Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF STATE;
ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; REX
TILLERSON, in his official capacity as Secretary of State,
*Defendants – Appellants.*

_____

No. 17-2240
(8:17-cv-00361-TDC)

_____

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself and its clients; HIAS, INC., on behalf of itself and its clients; JOHN DOES #1 AND 3; JANE DOE #2; MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members; MUHAMMED METEAB; ARAB AMERICAN ASSOCIATION OF NEW YORK, on behalf of itself and its clients,
*Plaintiffs – Appellants*,

and PAUL HARRISON; IBRAHIM AHMED MOHOMED; ALLAN HAKKY; SAMANEH TAKALOO,
*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; DANIEL R. COATS, in his official capacity as Director of National Intelligence,
*Defendants – Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................1

ARGUMENT ..........................................................................................5

I.  Plaintiffs' Claims Are Not Justiciable .........................................................5

    A.  Plaintiffs' Statutory Claims Are Not Justiciable .................................. 5

    B.  Plaintiffs' Establishment Clause Claims Are
        Not Justiciable ...................................................................... 9

II.  Plaintiffs Do Not Have A Likelihood Of Success On The
    Merits Of Their Statutory Or Constitutional Claims................................... 11

    A.  The Proclamation Is Consistent With The INA ................................11

        1.  The Proclamation Is Within The President's Statutory
            Authority Under Sections 1182(f) And 1185(a)(1) .................12

        2.  The Proclamation Does Not Violate Section
            1152(a)(1)(A) ...............................................................16

    B.  The Proclamation Is Consistent With The
        Establishment Clause .............................................................18

        1.  The Proclamation Is Constitutional Under *Mandel*
            Because It Relies On Facially Neutral And Bona
            Fide Reasons .................................................................18

        2.  The Proclamation Is Valid Under *McCreary*............................20

III.  The Balance Of Harms Weighs Strongly Against Preliminary Relief.........27

CONCLUSION ...................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                             **Page(s)**

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986),
*aff'd by an equally divided Court*, 484 U.S. 1 (1987) ................................. 6, 8, 13

*Allen v. Wright*,
468 U.S. 737 (1984) ....................................................................................9

*Allende v. Shultz*,
845 F.2d 1111 (1st Cir. 1988) ...................................................................13

*Arizona v. United States*,
567 U.S. 387 (2012)....................................................................................12

*Armstrong v. Exceptional Child Center, Inc.*,
135 S. Ct. 1378 (2015)..............................................................................8, 9

*Department of Navy v. Egan*,
484 U.S. 518 (1988) ....................................................................................6

*Fiallo v. Bell*,
430 U.S. 787 (1977) ..................................................................................20

*Haig v. Agee*,
453 U.S. 280 (1981) ..................................................................................27

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ....................................................................................6

*Hawaii v. Trump*,
No. 17-17168, Order (Nov. 13, 2017)..................................................28

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................................... 27

*International Union of Bricklayers v. Meese*,
761 F.2d 798 (D.C. Cir. 1985) ................................................................. 7

*IRAP v. Trump*,
   857 F.3d 554 (4th Cir. 2017),
   *vacated as moot*, 2017 WL 4518553 (U.S. Oct. 10, 2017) ........................ 2, 9, 19

*Kerry v. Din*,
   135 S. Ct. 2128 (2015) ................................................................... 9, 19

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................... 3, 9, 18, 19, 20

*Legal Assistance for Vietnamese Asylum Seekers v. Department of
   Justice*, 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*,
   519 U.S. 1 (1996) ................................................................... 6, 7, 8

*Lujan v. National Wildlife Fed'n*,
   497 U.S. 871 (1990) .........................................................................8

*McCreary County v. ACLU of Kentucky*,
   545 U.S. 844 (2005) ................................................... 3, 20, 26

*McGowan v. Maryland*,
   366 U.S. 420 (1961) ................................................................... 10, 26

*Mulligan v. Schultz*,
   848 F.2d 655 (5th Cir. 1988) .........................................................7

*Patel v. Reno*,
   134 F.3d 929 (9th Cir. 1997) .........................................................7

*Reno v. American-Arab Anti-Discrimination Committee*,
   525 U.S. 471 (1999) .......................................................................25

*Saavedra Bruno v. Albright*,
   197 F.3d 1153 (D.C. Cir. 1999).......................................................6, 8

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ................................................................... 6, 12

iv

*Sessions v. Morales-Santana,*
137 S. Ct. 1678 (2017) ...................................................................20

*Suhre v. Haywood Cty.,*
131 F.3d 1083 (4th Cir. 1997) ...........................................................9

*Trump v. IRAP*:
137 S. Ct. 2080 (2017) ...................................................................27

*Two Guys From Harrison-Allentown, Inc. v. McGinley*:
179 F. Supp. 944, 946 (E.D. Pa. 1959) ............................................10
366 U.S. 582 (1961) .........................................................................10

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ..................................................................... 5, 12

*Valley Forge Christian Coll. v. Ams. United for Separation of
Church & State, Inc.*, 454 U.S. 464 (1982) .................................. 9, 19

**Statutes:**

Administrative Procedure Act:
5 U.S.C. § 701(a)(1) ...........................................................................7
5 U.S.C. § 702(1) ................................................................................7
5 U.S.C. § 703 .....................................................................................8

Immigration and Nationality Act:
8 U.S.C. § 1152(a)(1)(A) ............................................ 3, 11, 16, 17, 18
8 U.S.C. § 1182(a) ........................................................................ 3, 13
8 U.S.C. § 1182(f) ...................................... 2, 3, 11, 12, 13, 14, 15, 16, 17, 18
8 U.S.C. § 1185(a)(1) .................................... 2, 3, 11, 12, 13, 16, 17, 18
8 U.S.C. § 1187(a)(3) ....................................................................... 24
8 U.S.C. § 1187(a)(12)(A) ..................................................................24
8 U.S.C. § 1187(a)(12)(D) ..................................................................24
8 U.S.C. § 1187(c) .............................................................................15

**Other Authorities:**

9 Foreign Affairs Manual 403.7-3 ............................................................8

9 Foreign Affairs Manual 504.1-3(f) ......................................................8

Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017) .................................... *passim*

U.S. Dep't of Homeland Security, Fact Sheet: The President's
    Proclamation on Enhancing Vetting Capabilities and Processes for
    Detecting Attempted Entry into the United States by Terrorists
    or Other Public-Safety Threats, https://www.dhs.gov/news/2017/09/24/
    fact-sheet-president-s-proclamation-enhancing-vetting-
    capabilities-and-processes ...................................................................24

# INTRODUCTION

The President issued Proclamation No. 9645 pursuant to his broad constitutional and statutory authority to exclude aliens whose entry he determines would be detrimental to the interests of the United States. The Proclamation was the product of a global review and evaluation of foreign governments' information-sharing practices and other risk factors, involving multiple Cabinet heads and other agency officials whose motives have never been questioned. That process culminated in a recommendation by the Acting Secretary of Homeland Security to restrict the entry of certain nationals of eight countries, and, acting in accordance with that recommendation, the President imposed tailored substantive restrictions for those eight countries to encourage improvement in their inadequate practices and to protect the Nation unless and until they do so.

Plaintiffs disregard these critical features of the Proclamation, simply labeling it a "re-animation" of the Executive Order (EO-2) previously before this Court. Br. 1-2. Relying on the views of former government officials and commentators, plaintiffs suggest that the entry restrictions in the Proclamation are unnecessary to protect national security or to encourage foreign governments to improve their practices. This Court should reject plaintiffs' invitation to second-guess the national-security and foreign-policy judgment of the President and his top advisors,

which could disable this President and future ones from addressing critical security risks and would impugn the validity of past Presidents' entry restrictions.

As an initial matter, there is no basis for allowing these harms because the district court exceeded the proper limits on its jurisdiction. As to plaintiffs' statutory claims, the political branches' exclusion of aliens abroad is beyond the province of courts to review absent express authorization by Congress. Plaintiffs neither identify any such authorization nor provide a principled justification why the rule should apply to individual decisions by subordinate officials but not to policy decisions by the head of the Executive Branch. As to plaintiffs' constitutional claims, this Court has previously recognized that alleged "condemnation" injuries are not cognizable absent "personal contact" with an Establishment Clause violation. *IRAP v. Trump*, 857 F.3d 554, 582 (4th Cir. 2017), *vacated as moot*, 2017 WL 4518553 (U.S. Oct. 10, 2017). Plaintiffs fail to explain how *their own* constitutional rights are violated merely because they allegedly suffer indirect injuries flowing from the Proclamation's alleged discrimination against aliens abroad who lack constitutional rights.

Plaintiffs' claims also fail on the merits. As to their claims under the Immigration and Nationality Act (INA), plaintiffs mischaracterize the government's position as being that the President can invoke 8 U.S.C. §§ 1182(f) and 1185(a)(1) to override Congress's judgment. Instead, and as the district court acknowledged,

Congress in § 1182(f) and § 1185(a)(1) ratified the President's authority *to supplement* 8 U.S.C. § 1182(a)'s grounds of inadmissibility by excluding aliens whose entry he finds to be detrimental. This includes, contrary to plaintiffs' suggestion, when entry would be detrimental because of concerns that are similar to ones that Congress has addressed in other INA provisions or that are focused on those aliens' governments. And where the problem sought to be addressed is nation-specific, it is wrong to read 8 U.S.C. § 1152(a)(1)(A)'s discrimination protections for eligible immigrant-visa applicants to impliedly repeal the President's authority under § 1182(f) and § 1185(a)(1) to suspend the entry eligibility of those nations' citizens. Notwithstanding plaintiffs' half-hearted denials, their arguments would necessarily imply that the actions of past Presidents were invalid, including President Carter's Iran order and President Reagan's Cuba order.

As to plaintiffs' Establishment Clause claim, they fail to show a constitutional violation under either the "facially legitimate and bona fide" standard in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), or the "secular purpose" standard in *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005). Plaintiffs' suggestion that the review and recommendation process that culminated in the Proclamation was a "pre-ordained" sham (Br. 2) is belied by the undisputed good faith of the agencies involved and the clear instructions in EO-2 to recommend only those restrictions they deemed appropriate. And plaintiffs' suggestion that there was "subjective,

post-hoc manipulation of the process to make the results even more of a Muslim ban" (*id.*) is irreconcilable with the substance of the tailored restrictions, which exclude two Muslim-majority countries from which entry was previously restricted (Iraq and Sudan); add two non-Muslim-majority countries and a third that is barely Muslim-majority (North Korea, Venezuela, and Chad); and provide additional exemptions for nonimmigrant visas from certain Muslim-majority countries (Somalia, Chad, Libya, Yemen, and Iran). Although plaintiffs emphasize that the process nevertheless culminated in coverage of mostly Muslim-majority countries that overlap substantially with those covered under EO-2, that hardly calls into question the validity of the process, because most of those countries were also previously identified by Congress or the Executive Branch as posing heightened risks. Plaintiffs further emphasize pre-Proclamation statements (and a few post-Proclamation statements) by the President that are alleged to show religious animus, but it is both illogical and dangerous to use such statements to disable the President from acting on the national-security and foreign-policy recommendations of his Cabinet.

Finally, even if some injunctive relief were appropriate, the district court erred in refusing to limit its injunction to identified aliens whose exclusion would impose concrete, irreparable harm on plaintiffs. *A fortiori*, this Court should reject plaintiffs' argument that the injunction should be expanded to reach aliens who lack

even a credible claim of a bona fide relationship with a person or entity in the United States, the exclusion of whom by definition causes no cognizable harm to plaintiffs.

## ARGUMENT

### I.      Plaintiffs' Claims Are Not Justiciable

#### A.      Plaintiffs' Statutory Claims Are Not Justiciable

**1.**      Plaintiffs' statutory claims are barred by the longstanding principle that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). Plaintiffs seek to cabin this principle to "review of purely statutory challenges to a *consular official's* decision to issue or withhold a visa." Br. 15. But regardless of whether a distinction between individualized decisions and broad policies might make sense in some contexts (*cf.* Br. 16-17), it makes no sense here, because it turns upside-down the separation-of-powers rationale of the nonreviewability principle.

Rather than relying on anything specific to the individualized nature of consular officials' visa decisions, the principle of nonreviewability of the exclusion of aliens rests more broadly on the "recognition that 'any policy toward aliens is vitally and intricately interwoven with * * * the conduct of foreign relations, the war power, and the maintenance of a republican form of government'"—matters "'so exclusively entrusted to the political branches of government as to be largely

5

immune from judicial inquiry or interference.'" *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)); *see also id.* at 1162 ("When it comes to matters touching on national security or foreign affairs * * * the presumption of review 'runs aground.'") (quoting *Department of Navy v. Egan*, 484 U.S. 518, 527 (1988)). That separation-of-powers rationale applies *a fortiori* to the President's policy decision to exclude certain classes of aliens abroad whose entry he finds would be detrimental to the interests of the United States, as compared to an individualized visa determination under the INA by a subordinate executive official.

2.     Unsurprisingly, plaintiffs fail to cite a single case prior to this litigation and the related *Hawaii* litigation where a court without express congressional authorization has held that judicial review is available of a statutory claim seeking to order the Executive to allow the entry of an alien abroad. Each case on which they rely (Br. 14-16) is readily distinguishable, including on grounds that the government explained in its opening brief yet plaintiffs notably ignore.

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 170-88 (1993), denied relief on the merits and did not address reviewability at all. Gov't Br. 25. *Abourezk v. Reagan*, 785 F.2d 1043, 1051 & n.6 (D.C. Cir. 1986), asserted that Congress had expressly authorized review, but Congress subsequently amended the INA to eliminate the purported authorization. Gov't Br. 22. *Legal Assistance for*

6

*Vietnamese Asylum Seekers v. Department of State*, 45 F.3d 469, 470 (D.C. Cir. 1995) (*LAVAS*), involved only a procedural question of where a visa interview would occur, and it was vacated in any event when Congress again abrogated the basis for review, 519 U.S. 1 (1996). *International Union of Bricklayers v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985), involved a challenge to aliens' admission (not exclusion) by unions that did not want competition. *Patel v. Reno*, 134 F.3d 929, 931-32 (9th Cir. 1997), involved a challenge to a consular officer's procedural authority to decline to act on a visa application, not a substantive decision to deny a visa. *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988), similarly challenged the procedure adopted by the Secretary of State for establishing chronological priority for visa applications, and the reviewability discussion was immaterial because relief was denied on the merits regardless.

3.      Plaintiffs also err in their arguments (Br. 17-19) that Congress has authorized judicial review under the Administrative Procedure Act (APA).

First, the APA does not apply where a statute "preclude[s] review" or the agency's action is otherwise nonreviewable. *See* 5 U.S.C. §§ 701(a)(1), 702(1). As the government showed in its opening brief (at 19-22, 24-25), those exemptions apply here, given the principle of nonreviewability of the exclusion of aliens abroad. Plaintiffs offer no response to that showing, nor to the government's related

demonstration that Congress expressly abrogated APA review even for the exclusion of aliens physically present in the United States at the border.

Second, plaintiffs have no statutory right to enforce under the APA. They invoke *Abourezk* and the vacated decision in *LAVAS*, but those decisions cannot be reconciled with *Saavedra Bruno* and *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), and plaintiffs make no attempt to do so. *See* Gov't Br. 24.

Third, there is no final agency action to review under the APA. Although plaintiffs emphasize that Presidential decisions can be challenged through actions of subordinate officials, they have not overcome the government's showing that there is no final action to challenge because none of their relatives or other aliens with whom they have a bona fide connection has actually been excluded yet by virtue of the Proclamation. *See* Gov't Br. 22-23. As for plaintiffs' observation that some relatives had completed interviews and were awaiting administrative processing, that means their visa applications had already been *denied* on independent grounds, *see* 9 Foreign Affairs Manual 504.1-3(f), 403.7-3, and it is unclear whether those relatives will ever be found otherwise eligible for a visa wholly apart from the Proclamation.

4.      Finally, plaintiffs cannot evade these problems by invoking (Br. 17) the Court's inherent equitable authority. The APA governs suits challenging government action, 5 U.S.C. § 703, and in any event *Armstrong v. Exceptional Child*

8

*Center, Inc.*, 135 S. Ct. 1378 (2015), makes clear that equitable authority is constrained by "express and implied statutory limitations" on review. *Id.* at 1385.

**B.  Plaintiffs' Establishment Clause Claims Are Not Justiciable**

Plaintiffs also argue (Br. 20) that the Proclamation's supposed condemnation of their religion provides Article III injury, but as the government's opening brief explained (at 27-28), mere stigma does not establish standing, for Establishment Clause purposes or otherwise. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982); *Allen v. Wright*, 468 U.S. 737, 755 (1984). A plaintiff must show "personal contact" with challenged government action, *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997); *IRAP*, 857 F.3d at 582-83, which is lacking here because the Proclamation does not apply to plaintiffs but only to third-party aliens abroad.

Plaintiffs argue (Br. 20) that their constitutional claims are no different than the ones reviewed by the Supreme Court in *Mandel* and *Kerry v. Din*, 135 S. Ct. 2128 (2015), but the plaintiffs in those cases alleged that the exclusion of aliens abroad violated their *own* constitutional rights. *See Mandel*, 408 U.S. at 770 (alleged free-speech right); *Din*, 135 S. Ct. at 2131 (alleged due-process right). Here, by contrast, plaintiffs are not asserting violations of their own constitutional rights, but instead indirect injuries resulting from the Proclamation's application to others—the individual plaintiffs' family members and the organizational plaintiffs' clients

9

abroad (who, moreover, themselves have no constitutional rights). In that context, the Supreme Court has held that plaintiffs may not sue. *See* Gov't Br. 26.

Plaintiffs argue that *Two Guys From Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582 (1961), recognized a company's standing to challenge a Sunday closing law "even though only the company's employees—not the company itself—had been regulated, prosecuted, and fined for violating a previous version of the law." Br. 21. That is incorrect. Like the employee in *McGowan v. Maryland*, 366 U.S. 420, 430-31 (1961), the business in *Two Guys* was directly regulated by the Sunday closing law, 366 U.S. at 583 n.1, and the Supreme Court characterized the challenge as one by the business to prevent enforcement of "th[e] statute against it," *id.* at 586. The law's operation against the employees was merely an additional means of regulating the businesses. *See Two Guys From Harrison-Allentown, Inc. v. McGinley*, 179 F. Supp. 944, 946 (E.D. Pa. 1959).

Finally, plaintiffs' suggestion (Br. 21) that alleged injury-in-fact alone is sufficient to bring an Establishment Clause claim—even where it is only the indirect effect of the challenged law's regulation of third parties—cannot possibly be correct. If true, for example, that would mean that a U.S. *Christian* could challenge the Proclamation's exclusion of his relatives who are Syrian Christians as a violation of *his own Establishment Clause* rights. That would be a nonsensical result.

**II. Plaintiffs Do Not Have A Likelihood Of Success On The Merits Of Their Statutory Or Constitutional Claims**

As the government's opening brief described (at 6, 8-12), the Proclamation is the result of a months-long worldwide review and process of diplomatic engagement that involved the efforts of multiple government agencies and officials whose motives have never been questioned. That process culminated in a recommendation from the Acting Secretary of Homeland Security, with which the President acted in accordance—namely, by adopting tailored substantive restrictions designed to encourage improvement by eight countries with inadequate information-sharing practices or other risk factors and to protect this Nation unless and until they do so. In light of these critical features of the Proclamation, plaintiffs' statutory and constitutional arguments all fail.

**A. The Proclamation Is Consistent With The INA**

Despite the district court's rejection of their argument, JA 1041-53, plaintiffs assert that the President exceeded his authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) because the Proclamation supposedly overrides the INA. Plaintiffs also defend the district court's narrower conclusion, JA 1034-40, that the Proclamation violates the prohibition on nationality-based discrimination for immigrant visas under 8 U.S.C. § 1152(a)(1)(A). Both arguments are incorrect.

### 1. The Proclamation Is Within The President's Statutory Authority Under Sections 1182(f) And 1185(a)(1)

**a.** Plaintiffs mischaracterize the government's position as asserting "limitless authority" for the President under 8 U.S.C. § 1182(f). Br. 28. Whatever the outer bounds of the President's power, the Proclamation's entry restrictions fall well within his legal authority and historical practice.

First, the entry restrictions are based on the President's determination that they are needed to encourage countries with inadequate information-sharing practices or other risk factors to improve their practices, while protecting the Nation from those risks in the interim. Plaintiffs posit hypotheticals (Br. 29) such as a ban on entry on all employment-based visas in order to affect the domestic labor market, but the exclusion of aliens abroad based on national-security and foreign-policy concerns is action taken at the height of the President's authority. *See* Gov't Br. 53-54. The President was exercising his "unique responsibility" over "foreign * * * affairs," *Sale*, 509 U.S. at 188, and his "inherent executive power" concerning the "admissibility of aliens," *Knauff*, 338 U.S. at 542, as well as his statutory authority in Sections 1182(f) and 1185(a)(1). Contrary to plaintiffs' suggestion (Br. 30), *Arizona v. United States*, 567 U.S. 387 (2012), holds that States lack power to regulate immigration because that power is exclusively "entrusted to * * * the Federal Government," *id.* at 409, *not* that the President lacks power to exclude aliens absent Congressional authorization. Accordingly, plaintiffs' separation-of-powers

concerns (Br. 2, 28, 30, 63) are at their nadir, and their non-delegation concerns (Br. 30) are misplaced.

Second, the President is supplementing the inadmissibility grounds in Section 1182(a) based on additional findings under Sections 1182(f) and 1185(a)(1). Plaintiffs argue that because of "Congress's detailed visa system," Br. 22, the President may not "override" specific provisions in the INA, Br. 28. But Congress has expressly authorized the President to impose additional limitations under Sections 1182(f) and 1185(a)(1). For example, in *Abourezk v. Reagan*, *supra*, and *Allende v. Shultz*, 845 F.2d 1111 (1st Cir. 1988), the courts held that a certain ground for visa ineligibility under Section 1182(a) required particular harm from the alien's *activities* in the United States rather than from their *mere entry* alone, but also held that the President nevertheless could rely on the entry-based harms to deny entry under Section 1182(f). *Abourezk*, 785 F.2d at 1049 n.2, 1053-60; *Allende*, 845 F.2d at 1116-18, 118 n.13, 1119. Indeed, the *Abourezk* Court noted that President Reagan had issued a Proclamation doing so for the entry of officers and employees of the Cuban Communist Party. 785 F.2d at 1049 n.2. Likewise, President Reagan later excluded all Cubans in response to a diplomatic dispute, and President Carter had previously authorized the exclusion of all Iranians in response to the Iranian hostage crisis. *See* Gov't Br. 37-38. These historic examples flatly refute plaintiffs' atextual arguments (Br. 31-32) that Section 1182(f)'s reference to "class[es] of aliens" does

not apply to entire nations, or that the President may take action under Sections 1182(f) and 1185(a)(1) only to address topics that Congress has not already addressed.

Plaintiffs likewise err in arguing that Section 1182(f) is limited to "foreign policy crises," Br. 32, or to "discrete, narrow, often fast-developing problems," Br. 40. Those restrictions appear nowhere in the statute. Nor is the President's Section 1182(f) authority confined to "limited" periods of time, Br. 31; to the contrary, it permits suspension of entry "for such period as he shall deem necessary." Plaintiffs' proposal invites judicial second-guessing of the President's discretion, without manageable criteria as to whether a particular foreign-policy problem is a true "crisis," is sufficiently "narrow," or has an appropriately "limited" duration. In any event, though, the findings in the Proclamation amply demonstrate the critical need for the entry restrictions.

**b.** Plaintiffs also argue that the Proclamation conflicts with the "basic operation of Congress's visa system," Br. 33, because, in their view, individualized vetting and screening through the visa application process is sufficient to address security concerns, Br. 34-36. Plaintiffs' argument fails for multiple reasons.

First, the fact that Congress generally requires individualized vetting and screening for visa applicants does not dictate how the President must treat nationals of countries with information-sharing inadequacies, and other risk factors, that

undermine the reliability of that vetting and screening process.  There is no reason to assume that Congress would have wanted to foreclose Presidential action and depend solely on the ability of individual consular officers to repeatedly recognize the problem of inadequate information-sharing by those foreign governments.  A systemic problem warrants a systemic solution, especially since such solutions are more likely to induce improvements by the foreign country.

Second, the President did not need to identify specific "vetting failures," Br. 40, in order to act on the *risk* of potential failures and the desire to *improve* information-sharing.  Again, plaintiffs' argument assumes that the President must focus only on individuals and individualized vetting, but Section 1182(f) permits the President to restrict the entry of "any class of aliens" whose entry would be detrimental to the interests of the United States, and authorizes the President to make his own judgment about the adequacy of existing restrictions on entry.

Third, as the district court correctly held (JA 1050), plaintiffs are wrong to argue that the Proclamation conflicts with the Visa Waiver Program (VWP), Br. 34-36.  For the specific purpose of the VWP's facilitation of travel, Congress has excluded a country if it fails any one of several criteria, *see* 8 U.S.C. § 1187(c), but Congress was not addressing the more general issue of what to do about a country that fails multiple criteria.  Although Congress decided that the appropriate consequence for countries that fail to meet a single statutory criterion is that their

nationals must obtain visas, that narrow decision in no way forecloses the President's determination that a different consequence is appropriate for countries that fail so many criteria that their information-sharing practices and other risk factors are collectively inadequate—namely, certain of their nationals shall be denied entry, unless a waiver applies. Likewise, the 2015 amendments to the VWP addressed the distinct problem of nationals of VWP countries who were either dual nationals of, or had traveled to, certain countries that posed heightened terrorism concerns yet could travel without a visa based on their VWP-country passport; the Proclamation, by contrast, addresses the problem of nationals traveling on passports from countries that have inadequate information-sharing practices or present other risk factors. In any event, even if plaintiffs were correct that the VWP and the Proclamation were sufficiently "close" in the topics they address, the fact that Congress addresses a specific situation in one provision of the INA does not foreclose the President from supplementing those provisions through his authority under Section 1182(f).

### 2. The Proclamation Does Not Violate Section 1152(a)(1)(A)

Plaintiffs do not dispute that Section 1152(a)(1)(A)'s nationality-discrimination ban is limited to *the issuance of visas* to otherwise-eligible aliens *by consular officers and other government officials*, whereas Sections 1182(f) and 1185(a)(1) address the *President's authority* to deem aliens *ineligible to enter* based

on the national interest. That is fatal to plaintiffs' statutory challenge given the judicial obligation to read the statutes in harmony rather than in conflict.

Plaintiffs argue that it would make "no sense" to ban nationality-discrimination in the issuance of immigrant visas if nationality nevertheless could be used as a basis to suspend entry. Br. 26. But this overlooks the obvious difference between Congress's constraining the ability of inferior Executive Branch officers to allocate immigrant visas among the set of aliens that Congress and the President allow to enter the country, and Congress's constraining the President's ability to exclude aliens from entering based on national-security and foreign-policy concerns. The latter would raise serious separation-of-powers concerns, and would necessarily imply the unlawfulness of President Reagan's order barring Cuban nationals and President Carter's order authorizing a ban on Iranian nationals. *See* Gov't Br. 37-38. Plaintiffs hypothesize that such restrictions are permissible under Section 1152(a)(1)(A) in case of "bilateral emergencies," Br. 27, but that atextual exception is created out of whole cloth in a failed effort to avoid the unacceptable consequences that follow from plaintiffs' interpretation. And again, plaintiffs provide no administrable standard for determining what constitutes an "emergency," or why that category does not include the inadequate information-sharing practices and other risk factors that the Acting DHS Secretary has identified for the President.

Furthermore, even if Sections 1182(f) and 1185(a)(1) were thought to conflict with Section 1152(a)(1)(A), the former would control. Contrary to plaintiffs' suggestion (Br. 26-27), if Section 1152(a)(1)(A) were a general ban on nationality discrimination concerning immigrant visas, it still would not supplant the more specific, and thus controlling, grants of authority in Sections 1182(f) and 1185(a)(1) for the President to restrict entry of aliens to protect the national interest, particularly in light of the serious constitutional concerns that a contrary construction would raise. Gov't Br. 36.

At a minimum, any possible violation of Section 1152(a)(1)(A) could not justify the district court's injunction. At most, the government would be required to issue immigrant visas to aliens whose entry would nevertheless remain suspended. And Section 1152(a)(1)(A) certainly could not require the government to issue visas or allow entry for *non*immigrants, as even plaintiffs do not dispute.

**B.    The Proclamation Is Consistent With The Establishment Clause**

**1.    The Proclamation Is Constitutional Under *Mandel* Because It Relies On Facially Legitimate And Bona Fide Reasons**

Plaintiffs fail to refute the government's showing that *Mandel* prohibits "looking behind" a facially legitimate and bona fide reason. Because the Proclamation's entry restrictions are rationally based on valid reasons, as the district court essentially recognized, *see* JA 1055, plaintiffs' Establishment Clause challenge

18

fails under *Mandel*. Gov't Br. 40-42; *see IRAP*, 857 F.3d at 588 (noting that *Mandel* governs constitutional challenges to the exclusion of aliens abroad).[1]

Plaintiffs argue (Br. 41-42) that *Mandel*'s reference to a "bona fide" reason authorizes a subjective pretext inquiry. But plaintiffs offer no response to our showing (Gov't Br. 41) that interpreting "bona fide" to require anything more than objective rationality is foreclosed by *Mandel*, where the Court explicitly rejected "look[ing] behind" the government's stated reason for denying a waiver of inadmissibility, 408 U.S. at 770, and declined Justice Marshall's invitation to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham." *Id.* at 778.

Plaintiffs next argue, relying on Justice Kennedy's concurrence in *Din*, 135 S. Ct. at 2141, that "an affirmative showing of bad faith" justifies further scrutiny of the government's stated rationale. Br. 42. But that misreads the *Din* concurrence, as the government explained (Gov't Br. 41-42), and plaintiffs fail to refute. Critically, Justice Kennedy merely noted that a plaintiff might be able to seek "additional factual details" where the government fails to offer *any* factual basis for

---

[1] Plaintiffs suggest (Br. 42 n.19) that *Mandel* should not govern because the Establishment Clause is a "structural[]" limitation on government action. The Supreme Court's jurisprudence does not countenance that kind of Establishment Clause exceptionalism. *See, e.g., Valley Forge*, 454 U.S. at 485-86 (The Establishment Clause "establishes a norm of conduct which the Federal Government is bound to honor—to no greater or lesser extent than any other inscribed in the Constitution.").

a consular officer's decision. 135 S. Ct. at 2141. When the government does identify a factual basis, though, Justice Kennedy properly recognized that that is the end of the analysis under *Mandel*. *See id.* at 2140 (citation of a rationally applicable statutory ground of inadmissibility is sufficient to establish that the government "relied upon a bona fide factual basis").

Plaintiffs also argue (Br. 43) that the Supreme Court's recent description of *Mandel*'s standard as authorizing only "minimal scrutiny (rational basis review)," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), does not foreclose their position, because that case cited *Fiallo v. Bell*, 430 U.S. 787 (1977), which involved a challenge to a congressional policy with no explanation of bad faith. But *Fiallo* recited and applied *Mandel*'s "legitimate and bona fide reason" standard. *Id.* at 794-95. And *Fiallo* acknowledged but declined to consider allegations of bad faith—namely, that the statutory distinctions at issue were "based on an overbroad and outdated stereotype concerning the relationship of unwed fathers and their illegitimate children" rather than any legitimate purpose. *Id.* at 799 n.9.

## 2. The Proclamation Is Valid Under *McCreary*

The Proclamation would be consistent with the Establishment Clause even if the Court were to ignore its facially legitimate and bona fide justification and look for "bad faith" under plaintiffs' view of *Mandel* or for a primary religious purpose or effect under *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005).

Plaintiffs fail to refute the critical features of the Proclamation that the government's opening brief emphasized, and their efforts nevertheless to equate the Proclamation with EO-2's temporary entry suspension also fail.

     **a.**    Plaintiffs have no meaningful response to the multi-agency review and recommendation process, which makes clear that the Proclamation was not the product of discriminatory animus. *See* Gov't Br. 43, 47-48.

First, plaintiffs provide no basis to question the integrity of the Cabinet heads and other government officials who conducted the review, formulated the recommendation to the President, and assisted the President in considering those recommendations; much less do plaintiffs provide evidence that those officials were motivated by discriminatory animus.[2]

Second, plaintiffs repeat the district court's erroneous conclusion that the outcome of the review process "was at least partially pre-ordained" because EO-2 "*required* the Secretary of Homeland Security to 'submit to the President a list of countries recommended for inclusion in a Presidential proclamation that *would prohibit the entry* of appropriate categories of foreign nationals.'" Br. 48; JA 1068.

---

[2] Relying solely on extra-record Internet articles that are not before this Court on appeal, plaintiffs question the motives of one official at DHS based on alleged prior statements unrelated to the Proclamation. Br. 5-6 nn.2-3. Even if that single subordinate were biased, plaintiffs fail to demonstrate that he somehow compromised the independent judgment of multiple Cabinet officials, whose motives plaintiffs have not challenged, or that he otherwise overbore the process with his personal views.

As the government's opening brief noted, though, this provision addressed only "foreign nationals of countries that have *not provided the information requested*"; it did not require the Secretary to conclude that *any* category of foreign nationals from those countries would be "*appropriate*" for an entry suspension; and it in no way constrained the Secretary's discretion to determine what additional information should be requested from any country in the first place. Gov't Br. 48. Plaintiffs are tellingly silent in response.

Third, plaintiffs speculate (Br. 47-50) that the Proclamation may diverge from the Acting Secretary of Homeland Security's recommendation in some unidentified respect. But the President's selection of countries from which to restrict entry mirrors the Acting Secretary's recommendation, *see* Procl. § 1(g)-(i), and the Proclamation's entry restrictions are "in accordance with" the Acting Secretary's recommendations, *see id.* § 1(h)(iii); *see also* Procl., pmbl. (noting that the President's determinations as reflected in the Proclamation were made "on the basis of recommendations from the Secretary of Homeland Security and other members of my Cabinet"). There is no basis to suggest any material difference between the recommendation and the Proclamation.

**b.** Plaintiffs also fail to counter our showing that the Proclamation's careful tailoring of substantive entry restrictions makes clear that they are not the product of anti-Muslim bias. *See* Gov't Br. 43-45.

For example, plaintiffs offer no explanation for why the Proclamation, if it were intended to discriminate against Muslims, would have omitted two Muslim-majority countries (Sudan and Iraq) from the seven countries from which EO-2 or its predecessor suspended entry. Similarly, plaintiffs do not explain why the Proclamation would have added only one new Muslim-majority country (Chad, which is only 52% Muslim), and two non-Muslim-majority countries (Venezuela and North Korea). Plaintiffs assert that the inclusion of Venezuela and North Korea will have "little practical consequence," Br. 45, but, even if that is so (which courts are ill equipped to second-guess), it simply underscores the good faith of the agency officials who applied their religion-neutral criteria consistently. Nor do plaintiffs offer any explanation for why the Proclamation would have provided exemptions for all or some nonimmigrant visa applicants from the Muslim-majority countries of Somalia, Chad, Libya, Yemen, and Iran.

Citing an Internet article, plaintiffs contend that the Proclamation is a religious gerrymander because it "ban[s] more Muslims and exempt[s] more non-Muslims than its 'baseline' criteria * * * would dictate." Br. 45. But the author of this article erroneously assumed that failure of any one of nine criteria in the baseline renders a country inadequate under the Proclamation, when instead the Acting Secretary of Homeland Security determined adequacy based on all nine criteria collectively. Procl. §§ 1(c), (e), 2; *see also* U.S. Dep't of Homeland Security, Fact Sheet: The

President's Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats, https://www.dhs.gov/news/2017/09/24/fact-sheet-president-s-proclamation-enhancing-vetting-capabilities-and-processes.

**c.** Plaintiffs also seek to impugn the integrity of the Proclamation based on various similarities between the Proclamation and its predecessor Executive Orders, but that attempt fails. For instance, it is unsurprising that, as Plaintiffs note (Br. 47), the multi-agency review process culminated in a recommendation to include under the Proclamation many of the same countries included in EO-2 and its predecessor: after all, five of those countries (Iran, Libya, Somalia, Syria, Yemen) were previously identified by Congress or the Executive Branch as posing heightened terrorism-related concerns based on criteria that the agencies likewise deemed relevant to their review and recommendation. *Compare* 8 U.S.C. §§ 1187(a)(3), (a)(12)(A), (a)(12)(D), (c)(2)(C)-(F), *with* Procl. § 1(c).

Nor is the Proclamation unconstitutional because, as plaintiffs further emphasize (Br. 49), it relies on many of the same criteria that were present in EO-2. The criteria that overlap are all religion-neutral and reflect compelling national-security interests, similar to the criteria that Congress and other Presidents have relied on in the past. *See* Gov't Br. 49 (noting, for example, that Iran "regularly fails to cooperate with the United States Government in identifying security risks" and

24

"is the source of significant terrorist threats") (quoting Procl. § 2(b)(i)).  The fact that serious national-security risks are posed by some Muslim-majority nations cannot prevent the government from addressing those problems, especially after the kind of extensive, multi-agency review process that occurred here.

Plaintiffs (Br. 50-51) seek to minimize those threats, but in so doing ignore the bedrock point that courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999) (*AAADC*). Plaintiffs' individual criticisms also fall short in their own right.  For instance, they rely on opinions of former national-security officials, but those officials were not part of the comprehensive worldwide review and evaluation process that led to the Proclamation.  The draft Department of Homeland Security reports that plaintiffs cite likewise predate that review, and also do not reflect the views of the then-Secretary.

Plaintiffs also take issue (Br. 47) with the "indefinite" duration of the Proclamation's entry restrictions, but contrary to their suggestion, indefinite does not mean "permanent."  The Proclamation requires periodic review of the restrictions, Procl. § 4, and "encourage[s] the countries to work with the United States to address [identified] inadequacies and risks so that the restrictions and

limitations imposed by this proclamation may be relaxed or removed as soon as possible," *id.* § 1(h). As the government explained in its opening brief (at 37-38), the entry restrictions imposed by President Carter and President Reagan were, if anything, more indefinite in scope.

**d.** Finally, plaintiffs' reliance (Br. 51-52) on statements by the President does not establish that the Proclamation was the product of anti-Muslim bias. As the government's opening brief explained (at 52), the statements primarily reflect an intent to protect the United States from the threat of terrorism by nationals from countries that pose heightened risks, and in any event cannot disable the President from adopting the Proclamation's religion-neutral restrictions in accordance with the national-security and foreign-policy recommendations of his Cabinet. Plaintiffs fail to acknowledge those key points, which distinguish the Establishment Clause cases they cite, *see* Br. 45-46, 51-55, all of which involved either explicit religious expression or discriminatory laws that lacked any valid secular purpose. For example, plaintiffs cite *McCreary*, *supra*, which involved a Ten Commandments display at a county courthouse, but make no attempt to refute our explanation for why that case is inapposite. Gov't Br. 45-46. Conversely, plaintiffs fail to address *McGowan*, *supra*, which *is* relevant and confirms that the Proclamation has a valid secular purpose and effect. Gov't Br. 46-47.

## III. The Balance Of Harms Weighs Strongly Against Preliminary Relief

The President has suspended the entry of aliens whose entry he has determined would be detrimental to the interests of the United States, exercising his broad constitutional and statutory authority. There is no "more compelling" interest than the security of the Nation, *Haig v. Agee*, 453 U.S. 280, 307 (1981), and the interest in combatting terrorism "is an urgent objective of the highest order," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Plaintiffs simply evade these harms by ignoring the prospect at the preliminary-injunction stage that the Proclamation will ultimately be upheld as lawful. Br. 56-57.

Plaintiffs also do not dispute that an injunction should extend no further than is necessary to redress plaintiffs' own injuries. Gov't Br. 56. Plaintiffs contend that it would be "difficult" to tailor the injunction to their own alleged injuries, Br. 57, but there would be little difficulty in tailoring an injunction to identified aliens whose exclusion imposes concrete, irreparable injury on plaintiffs.

It follows *a fortiori* that, contrary to plaintiffs' cross-appeal arguments (Br. 59-60), the injunction against the Proclamation should not be extended beyond foreign nationals with a credible claim of a bona fide relationship with a person or entity in the United States, under the Supreme Court's stay of the EO-2 injunctions in *Trump v. IRAP*, 137 S. Ct. 2080 (2017). Plaintiffs make the remarkable assertion that they will suffer irreparable harm from the exclusion of aliens with whom they

lack any relationship at all, but their argument rests on the abstract "condemnation" injuries that this Court already held are not cognizable at all without additional "personal contact." *Supra* p. 2. Indeed, when a district court in Hawaii recently enjoined enforcement of the Proclamation as to aliens without a credible claim of a bona fide relationship, the Ninth Circuit promptly stayed that portion of the injunction. *See Hawaii v. Trump*, No. 17-17168, Order (Nov. 13, 2017).

In arguing for broader injunctive relief, plaintiffs observe that the Proclamation will last longer than EO-2 and thus there is greater alleged injury even to those relationships that do not meet the standard established in the Supreme Court's stay decision. Br. 59-60. But such injuries concerning mere "friends and acquaintances" and other "insufficiently formal" connections (Br. 58-59) pale in comparison to the harm to the government's national-security and foreign-policy interests, especially since that harm is significantly greater under the Proclamation, which now reflects a multi-agency review and recommendation acted on by the President.

Finally, plaintiffs assert that the district court's injunction defined "bona fide relationships" differently than the Supreme Court did. Br. 63. But the district court simply repeated verbatim the Supreme Court's language, stated that IRAP and HIAS clients are not covered by the injunction "*absent* a separate bona fide relationship," and left for individualized determination whether a given relationship qualifies. JA

1080 (emphasis added).  And to the extent the district court's injunction is unclear, which the government believes it is not, plaintiffs can seek (and in fact have sought) clarification in district court.

## CONCLUSION

For these reasons and those stated in the Government's first cross-appeal brief, the district court's preliminary injunction should be reversed.  At a minimum, it should be vacated except for those identified aliens whose exclusion would impose a cognizable, irreparable injury on plaintiffs.  And in no circumstance should the injunction be extended to reach aliens without a bona fide relationship to a person or entity in the United States.

Respectfully submitted,

NOEL J. FRANCISCO
   *Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
   *Deputy Solicitors General*

CHAD A. READLER
   *Principal Deputy Assistant Attorney*
     *General*

STEPHEN M. SCHENNING
   *Acting United States Attorney*

HASHIM M. MOOPPAN
   *Deputy Assistant Attorney General*

/s/ Sharon Swingle
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7241*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-2689*

NOVEMBER 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limitations of Rule 32(a)(7)(B). The brief contains 6,544 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

/s/ Sharon Swingle
Sharon Swingle

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Sharon Swingle
Sharon Swingle